**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**ALABAMA**
**MOBILE DIVISION**

| | |
|---|---|
| **WEST ESCAMBIA UTILITIES AUTHORITY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No.:** _____ |
| **3M COMPANY, INC.; E.I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; EIDP, INC; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP; THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT COMPANY; BUCKEYE FIRE PROTECTION COMPANY; UTC FIRE & SECURITY; NATIONAL FOAM, INC.; and FICITIOUS DEFENDANTS 1-49,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

COMES NOW, the Plaintiff, West Escambia Utilities Authority ("West Escambia" or "Plaintiff"), by and through undersigned counsel, and allege upon information and belief as follows:

## INTRODUCTION

1. This action arises from the contamination of Plaintiff's drinking-water sources with per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), attributable to aqueous film-forming foam ("AFFF") used for firefighting, testing, and training at the Atmore

1

Municipal Airport. Plaintiffs seek to protect public health and the environment, and to recover its costs to investigate, monitor, treat, and remediate PFAS contamination and to abate the nuisance created by Defendants' products and conduct.

2.    Defendants designed, manufactured, marketed, distributed, and/or sold AFFF and component chemicals (including fluorosurfactants and perfluorinated intermediates) that they knew—or should have known—are mobile, persistent, bioaccumulative, toxic, and prone to leach into soil and groundwater when used as intended. Despite long-standing knowledge of these hazards, Defendants placed these products into the stream of commerce without adequate warnings or instructions and without adopting safer alternative designs.

3.    As a proximate result, PFAS has been detected in groundwater in or near Plaintiff's production wells serving West Escambia's customers and businesses (collectively, the "Wells"), forcing Plaintiff to incur substantial past and ongoing costs for testing, monitoring, public communications, interim measures (including alternate water supplies where necessary), and engineering studies.

<strong><u>JURISIDICTION AND VENUE</u></strong>

4.    This Court has subject matter jurisdiction under federal diversity jurisdiction, pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that lead to lead to Plaintiff's claims occurred in Escambia County, Alabama in the Southern District of Alabama.

<strong><u>PARTIES</u></strong>

6.    Plaintiff West Escambia Utilities Authority is a domestic, incorporated public utility,

2

formed pursuant to Alabama Code §11-50-230, with its principal place of business located in Escambia County, Alabama. Plaintiff is organized under the laws of the State of Alabama and provides water and sewer services to the City of Atmore and others located in or around Escambia County.

7.    Plaintiff West Escambia has a duty to provide safe drinking water to the citizens of the Atmore community and other parts of Escambia County. West Escambia operates a drinking water treatment plant and multiple drinking water wells and related property. It draws raw water from groundwater wells, which pump that water to its plant for treatment. West Escambia owns these properties, holds riparian rights in and to the groundwater, and acquires legal ownership of the water it draws from its wells for treatment and sale to its customers.

8.    Defendant, The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) (hereinafter referred to as "3M"), is a Delaware corporation that does business throughout the United States, including in Alabama. 3M has its principal place of business in St. Paul, Minnesota.

9.    3M designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

10.    Defendant, E.I. DuPont de Nemours and Company ("DuPont" or "Old DuPont"), is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont does business throughout the United States, including in Alabama.

11.    DuPont manufactured, marketed, promoted, distributed, and/or sold products

3

containing PFOA and/or PFOS, or products which degraded into PFOA and/or PFOS, that were used in AFFF. Specifically, DuPont was a founding member of the Fire Fighting Foam Coalition and through its active participation in the Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers. They have been involved with the production and sale of PFAS, fluorochemical products, and fluorochemical intermediaries for use in AFFF manufacturing since the 1950's.

12.  Defendant, The Chemours Company ("Chemours"), is a Delaware corporation with its principal place of business in Wilmington, Delaware. Defendant The Chemours Company FC, LLC is a foreign corporation qualified to do business in the State of Alabama. Defendants The Chemours Company and The Chemours Company FC, LLC are hereinafter collectively referred to as "Chemours."  Chemours does business throughout the United States, including in Alabama. In 2015, DuPont spun off its "performance chemicals" business into Chemours. This appears to have included DuPont separating its fluorochemical products and chemical solutions business divisions from the main company. Chemours have been involved in the manufacture, sale, and distribution of PFAS-containing intermediates and fluorochemical products. Further, in 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff, Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA/PFOS. DuPont and Chemours, as alleged in detail below fraudulently conveyed the assets and liabilities of DuPont in this spin-off.

13.  Defendant, Corteva, Inc. ("Corteva"), is a Delaware corporation with its principal place of business in Wilmington, Delaware. Corteva does business throughout the United States, including in Alabama. Corteva was formed through a series of transactions initiated by the merger

of DuPont and the Dow Chemical Company ("Dow") in 2017, which formed DowDuPont, Inc. ("DowDuPont"). At that time DuPont and Dow each became subsidiaries of DowDuPont. In 2018, Corteva was formed as a subsidiary of DowDuPont, and in 2019 DowDuPont spun off its agricultural business into Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale.

14. Defendant, DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont"), is a Delaware corporation with its principal place of business in Wilmington, Delaware. New DuPont does business throughout the United States, including in Alabama. DowDuPont became New Dupont following the Corteva spin-off. New DuPont assumed direct liability for Old DuPont's history of widespread PFAS contamination around the country.

15. Defendant EIDP, Inc., formerly known as "E.I. du Pont de Nemours and Company," is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. EIDP, Inc. is registered to do business in the State of Alabama.

16. Defendants Old DuPont, New DuPont, Chemours, EIDP, Inc., and Corteva are collectively referred to herein as the "DuPont Defendants."

17. Defendant, Chemguard, Inc. ("Chemguard"), is a Wisconsin corporation with its principal place of business located in Marinette, Wisconsin. Chemguard does business throughout the United States, including in Alabama.

18. Defendant, Tyco Fire Products LP ("Tyco"), is a limited partnership formed in the State of Delaware, with its principal place of business located in Marinette, Wisconsin. Tyco is an

5

indirect subsidiary ultimately wholly owned by Johnson Controls International plc, which is an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company, having acquired Ansul in 1990.

19. Beginning in around 1975, Ansul manufactured and distributed fire suppression products, including AFFF that contained PFAS compounds. Ansul had a fire-fighting foam product named "TARGET-7." Ansul initially used fluorosurfactant from Ciba-Geigy (Lodyne S-112) for Ansul's fluoro-telomerization process to manufacture AFFF. Ansul's foam was known as Ansulite or AnsulAFFF. Suppliers of fluorosurfactants to Ansul include Dynax Corporation ("Dynax"), Chemguard, and Atochem (f/k/a Archema, Inc.). Ansul's AFFF does not contain perfluorooctane sulfonate ("PFOS") due to their telomerization process but did contain perfluorooctanoic acid ("PFOA"). Ansul's AFFF products were first sold to the U.S. Government in 1976. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell AFFF that contained fluorocarbon surfactants containing PFOA.

20. At all times relevant, Chemguard and Tyco/Ansul manufactured fire suppression products, including AFFF that contained PFAS compounds. Chemguard makes both 3% and 6 fluorotelomer-based AFFF. Chemguard's AFFF was first sold to the U.S. Government in 1998. Chemguard also manufactured and sold its own fluorosurfactants to other AFFF manufacturers, including National Foam, Inc. Chemguard purchased other fluorosurfactants from Ciba-Geigy (Lodyne), Dynax, Chemours, and Atochem.

21. Defendants, Buckeye Fire Equipment Company and Buckeye Fire Protection Company (collectively "Buckeye"), are Ohio corporations with their principal place of business located in Kings Mountain, North Carolina. Buckeye does business throughout the United States, including in Alabama. At all times relevant, Buckeye manufactured fire suppression products,

including AFFF that contained PFAS compounds.

22.   Defendant, National Foam, Inc. (a/k/a Chubb National Foam) ("National Foam"), is a Pennsylvania corporation with its principal place of business in West Chester, Pennsylvania. National Foam does business throughout the United States, including in Alabama. At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds.

23.   UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC does and/or has done business throughout the United States and manufactured and sold AFFF. 65. Upon information and belief, UTC was created when United Technologies acquired Kidde PLC, Inc. and combined it with Chubb Fire, Ltd., a United Kingdom private limited company. On information and belief, UTC became a subsidiary of Raytheon Technologies (n/k/a RTX) when UTC merged with the Raytheon Company. UTC does business throughout the United States, including in Alabama. UTC manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances.

24.  Upon information and belief, FICTITIOUS DEFENDANTS 1-49 were manufacturers, distributors, and/or sellers of products that contained PFAS compounds. Plaintiff presently lacks information sufficient to specifically plead the identity or name of these Defendants. Plaintiff will amend this Complaint to show their true names if and when they are ascertained.

25.   When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of

7

the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

26. The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this complaint, jointly and severally, unless otherwise stated.

## FACTUAL ALLEGATIONS

**POLYFLUOROALKYL SUBSTANCES ("PFAS")**

27. PFAS are synthetic chemicals characterized by carbon-fluorine bonds that resist degradation, rendering them persistent in the environment; they are mobile in groundwater and bioaccumulative in humans and wildlife. Exposure is associated with adverse health effects, including impacts on the immune system, liver, thyroid, and increased risk of certain cancers. Defendants have known for decades that PFOS/PFOA are highly persistent and that AFFF use results in environmental releases with foreseeable migration to drinking-water supplies.

28. Aqueous Film-Forming Foam ("AFFF") is a combination of chemicals used to extinguish hydrocarbon fuel-based fire.

29. AFFF-containing fluorinated surfactants have better firefighting capabilities than water due to their surfactant-tension lowering properties which allow the compound(s) to extinguish fire by smothering, ultimately starving it of oxygen.

30. AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish

8

fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

31. AFFF used for Class B fires historically contained PFOS and/or PFOA (or precursors that degrade to PFOS/PFOA) as fluorosurfactants. AFFF is often discharged outdoors in training, equipment testing, and emergency response. Defendants knew that such uses, even when "as directed," would result in releases to soil and groundwater and threaten public water systems.

32. Defendants designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting, that were used by entities around the country, including municipal airports.

33. Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS, in such a way as to cause environmental and economic injuries, contamination and unlawful incursion onto the Plaintiff's land, surface and subsurface soil, sediment, natural resources, and municipal real property.

34. Feasible non-fluorinated alternative foams have existed and continue to exist for firefighting applications, particularly for training and testing, that avoid persistent PFAS contamination. Defendants nevertheless continued to sell PFAS-based AFFF and failed to provide adequate warnings and instructions to prevent environmental releases.

35. AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the United States and in other parts of the world. It contains PFAS, which are highly fluorinated synthetic chemical compounds whose family include PFOS and PFOA.

36. PFAS have been used for decades in the manufacture of AFFF. The PFAS family of chemicals are entirely human-made and do not naturally occur or otherwise exist.

37. Prior to commercial development and large-scale manufacture and use of AFFF containing PFAS, no such PFAS had been found or detected in human blood.

**The Atmore Municipal Airport and Plaintiff's Wells**

38. The Atmore Municipal Airport (owned by the City of Atmore and located within or adjacent to Atmore, Alabama) conducts or has historically conducted firefighting, testing, and training activities that used AFFF. On information and belief, those activities resulted in repeated releases of PFAS-containing AFFF to the environment for many years.

39. Groundwater beneath and downgradient of Atmore Municipal Airport flows toward the areas where Plaintiff's wells are located. On information and belief, PFAS has been detected in groundwater and/or in finished water at or near levels that necessitate ongoing investigation and response, including sampling, public communication, planning, and installation and operation of PFAS treatment (e.g., GAC/IX or other technologies) to ensure compliance with evolving state and federal standards.

40. Plaintiff has incurred and will continue to incur substantial costs to investigate, monitor, and treat PFAS, to design, construct, operate, and maintain treatment systems; to manage residuals; to supply interim water or interconnections as necessary; and to implement other measures to protect public health.

**AFFF/PFAS HAZARDOUS EFFECTS**

41. AFFF and its components are associated with a wide variety of adverse health effects in humans.

42. Exposure to Defendants' AFFF has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular cancer, liver cancer, testicular tumors, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease, and

infertility.

43.     By at least the end of the 1960s, animal toxicity testing performed by Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

44.     By at least the end of the 1960s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

45.     By at least the end of the 1970s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and persist over long periods of time and would accumulate in the blood/body of the exposed individuals with each additional exposure.

46.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS indicated that at least one such PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

47.     It was understood by Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans unless the precise mechanism of action by which the tumors were caused was known and would not occur in

11

humans.

48.     By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of carcinogenesis classification mandated Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

49.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

50.     By at least the end of the 1980s, Defendants, including at least 3M and DuPont, understood that, not only did PFAS, including at least PFOA and PFOS, get into and persist and accumulate in the human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS, such as PFOS and PFOA, had a long half-life. Meaning that it would take a very long time before even half of the material would start to be eliminated, which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposure continued.

51.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

52.     By at least the end of the 1990s, the precise mechanism(s) of action by which any

PFAS caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

53. By at least 2010, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

54. When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposure presented no risk of harm and were of no significance.

55. After the USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

56. Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials also have been found in human blood.

57. By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

13

58.     Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

59.     Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States present no risk of harm and is of no legal, toxicological, or medical significance of any kind.

60.     At all relevant times, Defendants, individually and/or collectively, possessed the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

61.     Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and

14

the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

62.    At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

63.    As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States.

64.    There is no naturally occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

65.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

66.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical

15

significance associated with the presence of PFAS in human blood.

67.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiff to the legal, toxicological, medical, or other significance and/or risk of PFAS exposure.

68.    At all relevant times, Defendants encouraged the continued and even further increased use of PFAS by their customers and others, including but not limited to the manufacture, use, and release, of AFFF containing PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

69.    To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

70.    To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

71.    Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring

16

to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

72.     Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF containing PFAS would result in the contamination of the property of Plaintiff with PFAS, and the biopersistence and bioaccumulation of such PFAS in property.

73.     Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the property of Plaintiff would cause injury and irreparable harm.

74.     Defendants did not seek or obtain permission or consent from Plaintiff before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiff's property contamination to AFFF, and resulting biopersistence and bioaccumulation of such PFAS on Plaintiff's property.

**Defendants' History of Manufacturing and Selling AFFF**

75.   3M began producing PFOS and PFOA by electrochemical fluorination in the 1940s. In the 1960s, 3M used its fluorination process to develop AFFF.

76.   3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

77.   National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

78.   Buckeye began to manufacture, market, and sell AFFF in the 2000s.

79.   In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our

products are safe," and that 3M's decision was "based on [its] principles of responsible environment management."  3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk."  In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

80.   Following 3M's exit from the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF that contained PFAS and/or its precursors.

81.   AFFF Defendants knew their customers warehoused large stockpiles of AFFF. In fact, AFFF Defendants marketed their AFFF products by touting its shelf-life. Even after AFFF Defendants fully understood the toxicity of PFAS, and their impacts to the health of humans following exposure, AFFF Defendants concealed the true nature of PFAS. While AFFF Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS and/or their precursors. AFFF Defendants further did not act to get their harmful products off the market.

82.   AFFF Defendants did not warn public entities, firefighter trainees who they knew would foreseeably come into contact with their AFFF products, or firefighters employed by either civilian and/or military employers that use of and/or exposure to AFFF Defendants' products containing PFAS and/or its precursors would pose a danger to human health.

83.   Plaintiff's were exposed to PFAS contamination, directly through contaminated drinking water.

84.   The Plaintiff was never informed that the water was dangerous. Nor was the Plaintiff warned about the known health risks associated with Defendants' PFAS chemicals.

85.   Defendants have known of the health hazards associated with PFAS and/or its

18

compounds for decades and that in their intended and/or common use would harm human health.

86. Information regarding PFAS and its compounds were readily accessible to the Defendants for decades because each is an expert in the field of PFAS manufacturing and/or the materials needed to manufacture PFAS, and each has detailed information and understanding about the chemical compounds that form PFAS products.

87. The Defendants, through their manufacturing, storing, and inappropriate releases of PFAS, knew, foresaw, and/or should have known and/or foreseen that the Plaintiff and those similarly situated would be harmed.

88. The Defendants' products were unreasonably dangerous, and the Defendants failed to warn of this danger.

## COUNT ONE

### Negligence

89. West Escambia incorporates all prior paragraphs by reference as if fully set forth herein.

90. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, disposers, and/or handlers of PFAS, products containing and/or degrading into PFAS, products manufactured using PFAS, and/or waste containing and/or degrading into PFAS, Defendants owed a duty to West Escambia, as well as to all persons whom Defendants' PFAS might foreseeably harm, in their handling, control, use, and disposal of PFAS.

91. Defendants owed a duty to West Escambia to avoid intentionally or negligently causing or permitting any AFFF or any substance containing PFAS to be discharged or deposited into the environment.

19

92. Defendants owed a duty to West Escambia to exercise reasonable and due care to prevent the discharge of AFFF chemicals into West Escambia's water supply, water treatment facilities, and related property.

93. As described herein, Defendants breached duties owed to West Escambia. Under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct. Defendants' conduct, practices, actions, and inactions combined and concurred to harm West Escambia and its water supply, and as a result West Escambia has incurred expenses and will incur reasonably ascertainable expenditures in the future.

94. West Escambia has a reasonable expectation that Defendants avoid contaminating their drinking water and the surrounding environment – an expectation that extends to the pollution of the groundwater and other water sources.

WHEREFORE, West Escambia demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## <u>COUNT TWO</u>

### Public Nuisance

95. West Escambia incorporates all prior paragraphs by reference as if fully set forth herein.

96. West Escambia owns and occupies property used to serve its water customers, including a water treatment plant, water distribution system, related equipment and property, and offices.

97. Defendants have created a nuisance by failing to prevent the contamination of AFFF into the environment, which has caused contamination of West Escambia's water supply,

20

thereby causing West Escambia hurt, inconvenience, and harm. The nuisance created by Defendants' PFAS is continuous and ongoing.

98.     In addition, there exist at least two completed physical conditions that have been created by past acts and omissions of the Defendants (even as current acts continue to add to these conditions).  These are (a) the accumulation and adsorption of PFAS in soils bordering water sources which Plaintiff relies on, and (b) the accumulation and adsorption of PFAS within the raw water sources on from which Plaintiff draws water.  PFAS from these existing conditions is continually being desorbed and released and is continually migrating to and invading the Plaintiff's drinking water supply and Plaintiff's drinking water plant.  Each of these existing conditions and its ongoing effects are controllable and abatable by Defendants, but remain unabated, and thus constitutes a continuing nuisance.  Plaintiff suffers daily recurring injury as result of each of these continuing nuisances.

99.     This nuisance is an abatable nuisance.

100.    In addition to the special damages sustained by West Escambia, the levels of toxic chemical contamination found in West Escambia's water supply, directly caused by Defendants combined and concurring conduct, have created a condition that threatens the health and well-being of West Escambia's customers.

101.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would place, and have placed, West Escambia at risk of harm. The nuisance has caused substantial damage and will continue to cause damage until West Escambia receives compensatory damages for the necessary permanent improvements of filtration technology that will allow for the removal of PFAS from West Escambia's water supply.

21

102.    Defendants knew it was substantially certain that their acts and omissions would cause West Escambia's water and real property to become contaminated with PFAS. Defendants have acted with a conscious indifference to the probable dangerous consequences of their actions and the reasonably foreseeable impact such actions would have on public health and welfare.

WHEREFORE, West Escambia demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT THREE

### Private Nuisance

103.    West Escambia re-alleges all prior paragraphs as if set forth fully herein.

104.    West Escambia owns and occupies property used to serve its water customers, including a water distribution system, a water treatment plant, a wastewater treatment plant, offices, and associated facilities and equipment.

105.    West Escambia owns land and water rights which permit it to draw groundwater to provide drinking water to its customers. West Escambia has a possessory interest in the water it withdraws in order to treat and sell to its customers.

106.    Defendants have created a nuisance by their failure to prevent the contamination of West Escambia's water supply, thereby causing West Escambia hurt, inconvenience, and harm. Defendants have caused, contributed to, and/or maintained such nuisance, and are a substantial contributor to such nuisance.

107.    The contamination of West Escambia's groundwater and raw water source, water treatment plant, and related property constitutes a private nuisance depriving West Escambia of

the ability to deliver clean and uncontaminated water to its customers. This nuisance is continuous and ongoing.

108. The specific damages incurred by a water system like West Escambia includes, but is not limited to, expenses associated with the past and future installation and operation of a filtration system capable of removing PFAS from the water; expenses incurred to monitor PFAS contamination levels; expenses incurred to remediate Defendants' contamination; expenses to properly dispose of PFAS removed from drinking water; and lost profits and sales. These special damages are separate and distinct than those faced by the general public.

109. It was reasonably foreseeable, and in fact known to Defendants, that their actions would place, and have placed, West Escambia at risk of harm. The contamination caused, contributed to, and/or perpetuated by Defendants substantially and unreasonably interferes with West Escambia's property rights to appropriate, use, and enjoy PFAS free groundwater and real property.

110. Defendants' nuisance has caused substantial damages and will continue to cause damages until West Escambia receives compensatory damages for the necessary permanent improvements of filtration technology that will allow for the removal of PFAS from West Escambia's water supply.

111. As a direct and proximate result of Defendants' acts and omissions as alleged herein, West Escambia has incurred, is incurring, and will continue to incur damages related to Defendants' PFAS contamination.

112. Defendants knew they were substantially certain that their acts and omissions described herein would cause injury and damage to West Escambia's property, including PFAS contamination of West Escambia's water supply and related property. Defendants committed each

of the above-described acts and omissions willfully and with malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifferent to consequences in order to promote sales of their products and/or services. West Escambia therefore demands an award of punitive damages because of the aggravating circumstances alleged herein in order to penalize, punish, and deter Defendants' conduct.

WHEREFORE, West Escambia demands judgment for compensatory and punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FOUR

### Trespass

113. West Escambia incorporates all prior paragraphs by reference as if fully set forth herein.

114. West Escambia owns and occupies property used to serve its water customers, including water treatment plants, water distribution system, associated facilities and equipment, and offices.

115. West Escambia owns land and water rights which permit it to draw groundwater to provide drinking water to its customers. West Escambia has a possessory interest in the water it draws in order to treat and sell it to customers.

116. West Escambia produces and sells finished potable water to customers in the form of finished drinking water. This finished potable water is West Escambia's personal property separate and apart from the raw untreated groundwater.

117.    Defendants' intentional acts in manufacturing, supplying, using, and/or discharging PFAS and/or products and waste containing or degrading into PFAS, with full knowledge that the chemicals would contaminate West Escambia's water supply, caused an invasion of West Escambia's possessory interest in its property, which has affected and is affecting West Escambia's interest in the exclusive possession of its property, and constitutes trespass to real property and chattels.

118.    West Escambia has at no time consented to the contamination of its water supply or the invasion of its property and possessory interests by Defendants' PFAS.

119.    Defendants knew or should have known that their manufacture, use, purchase, sale, supply, disposal, discharge, and/or release of PFAS and PFAS-containing products could contaminate the water supply and result in an invasion of West Escambia's possessory interest in its property.

120.    Defendants' trespass is continuous and ongoing.

121.    Defendants' continuing trespass has impaired West Escambia's use of real and personal property and has caused substantial damages.

WHEREFORE, West Escambia demands judgment for compensatory and punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FIVE

### Wantonness and Punitive Damages

122.    West Escambia incorporates all prior paragraphs by reference as if fully set forth herein.

123.    As described herein, Defendants owed a duty to West Escambia to exercise due and reasonable care in their manufacture, distribution, supply, and use of PFAS and to prevent the release of PFAS into West Escambia's water supply.

124.    Defendants breached these duties. In so doing, Defendants acted in a wanton, willful, and reckless manner.

125.    Defendants knew or should have known the danger to West Escambia created by Defendants' conduct, practices, actions, and inactions.

126.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on West Escambia.

127.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard of the known risk of harm to West Escambia.

128.    Defendants' conduct, practices, and inactions combined and concurred to harm West Escambia.

WHEREFORE, West Escambia demands judgment for punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

**<u>RELIEF DEMANDED</u>**

WHEREFORE, West Escambia respectfully requests this Court grant the following relief:

a) Award West Escambia damages in an amount to be determined by a jury sufficient to compensate it for removing PFAS from West Escambia's drinking water, disposing of PFAS removed from West Escambia's drinking water, real property damage, out of pocket expenses, potential lost profits and sales, and future expenses.

b) Issue an injunction requiring Defendants to remove their chemicals from West Escambia's water supply and to prevent these chemicals from continuing to contaminate West Escambia's water supply.

c) Award punitive damages.

d) Award attorney fees and costs and expenses incurred in connection with the litigation of this matter.

e) Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Dated: April 10, 2026

Respectfully submitted,

*/s/ Matthew R. Griffith*
MATTHEW R. GRIFFITH (GRI085)[†]
Matt.Griffith@BeasleyAllen.com
RHON E. JONES (JON093)
Rhon.Jones@BeasleyAllen.com
JEFF D. PRICE (PRI086)
Jeff.Price@BeasleyAllen.com
WILLIAM R. SUTTON (SUT013)
William.Sutton@BeasleyAllen.com
ELLIOT S. BIENENFELD (BIE005)
Elliot.Bienenfeld@BeasleyAllen.com

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
P.O. Box 4160
Montgomery, Alabama 36103
[†]301 St. Louis Street
Mobile, AL 36602
T: 334-269-2343
F: 334-954-7555

**Attorneys for Plaintiff**

27

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL**